# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 25, 2012 at Knoxville

## STATE OF TENNESSEE v. BOBBY JOE LADD

**Appeal from the Circuit Court for Montgomery County**
**Nos. 40500655, 40901032    Michael R. Jones, Judge**

---

**No. M2011-02537-CCA-R3-CD - Filed September 21, 2012**

---

The defendant, Bobby Joe Ladd, appeals the revocation of his probation, claiming that the evidence preponderates against the findings of the trial court. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Kimberly G. Turner, Clarksville, Tennessee, for the appellant, Bobby Joe Ladd.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Assistant Attorney General; John Carney, District Attorney General; and Lee Willoughby, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On October 3, 2005, the defendant pleaded guilty in case number 40500655 to one count of robbery and received a Range I sentence of eight years to be served on probation. On October 19, 2009, the defendant pleaded guilty in case number 40901032 to one count of aggravated assault and received a Range I sentence of five years to be served on probation. The five-year probationary term in case number 40901032 was to be served concurrently to the eight-year term imposed in case number 40500655.

On July 1, 2009, a probation violation warrant issued alleging that the defendant had violated the terms of his probation in case number 40500655, and the trial court revoked the probation on the basis of his conviction in case number 40901032. The court ordered the defendant's probation reinstated after service of 118 days' incarceration.

On January 5, 2011, a probation violation warrant issued alleging that the defendant had violated the terms of the concurrent probationary sentences in case numbers 40500655 and 40901032 by committing murder and by possessing a knife during the commission of the murder.

At the October 28, 2011 probation revocation hearing, Montgomery County Sheriff's Department Deputy Kelly Joe Potter testified that he was dispatched to a residence near Lylewood Road to investigate "a stabbing in progress." He said that he was the first officer to arrive on the scene. As he approached the garage, he observed the victim, Eric Latham, bleeding from a stab wound on the side of his neck. A woman named Jessica Brewington was applying pressure to the victim's wounds. Jessica Brewington told Deputy Potter that the defendant had stabbed the victim. The victim told Deputy Potter "that he felt like he was dying."

After emergency medical personnel arrived, Deputy Potter "deployed" his police dog "up Lylewood at the intersection of John Taylor and Lylewood" to assist in locating the defendant. He said that witnesses had reported seeing a man matching the defendant's description "going in and out of the woods" in that area.

Montgomery County Sheriff's Department Deputy James Derico testified that he found the defendant "approximately a half of a mile . . . north of the residence." Deputy Derico said that when he saw the defendant, he drew his weapon and ordered the defendant to walk in the direction of Deputy Carl Magee, who was with Deputy Derico. Once the defendant got nearer to them, Deputy Derico ordered him onto the ground and then handcuffed him as he lay. When he helped the defendant to his feet, he asked the defendant the location of the knife he had used during the stabbing. The defendant told Deputy Derico that he "threw it down in the woods." Deputy Derico said that the defendant's clothing was wet and that he "had some kind of a red stain on the front of his shirt."

During cross-examination, Deputy Derico conceded that he did not provide the defendant with *Miranda* warnings before asking about the location of the knife.

During redirect examination, Deputy Derico said that he inquired about the location of the knife during Deputy Magee's pat-down of the defendant because he "was concerned about the knife for [his] safety."

Montgomery County Sheriff's Department Deputy Carl Magee testified that he responded to "a stabbing call" at a residence in "the area of Lylewood Drive." He said that he was "put on perimeter guard of an area that was going to be searched for the suspect." In performance of this duty, Deputy Magee encountered the defendant "in the vicinity of

Charles Taylor Road, approximately the 3200 block of Lylewood Road." Deputies Magee and Derico drew their weapons, ordered the defendant to the ground, and Deputy Magee handcuffed him. Deputy Magee said that both he and Deputy Derico asked the defendant about a weapon, and the defendant told them that he had thrown it in the woods. Deputy Magee said that he made the inquiry as he was placing the handcuffs on the defendant and that he did not provide the defendant with *Miranda* warnings before asking the question.

Montgomery County Sheriff's Department Deputy Mike Cereceres also responded to the stabbing call and was charged with "canvass[ing] the area . . . looking for the suspect." Although he did not find the defendant, he assisted other officers in transferring the defendant into a nearby patrol car. He saw that there were "extremely wet" stains on the defendant's clothing. He said he overheard the defendant claim that he had stabbed the victim in self-defense.

Montgomery County Sheriff's Department Deputy Case Bohn also responded to the stabbing call, traveling straight to the area where the defendant had last been seen. After his arrest, the defendant was placed into Deputy Bohn's patrol car to be transported to the Criminal Justice Center. Deputy Bohn testified that the defendant "was visibly upset" and was "very cold and wet." Deputy Bohn said that as they drove, the defendant inquired about the condition of the victim. Deputy Bohn testified that although he did not provide the defendant with the traditional *Miranda* warnings, he did advise the defendant that any statement he made could be used against him. At that point, the defendant said "that the victim had been messing with him all night and that he had acted in self[-]defense." Deputy Bohn said that he told the defendant to make his statement to the investigator. According to Deputy Bohn, the defendant then "became agitated, he stated that the only reason we wanted to prosecute him was because of his color."

Montgomery County Sheriff's Department Investigator Larry Hodge, who was assigned as the primary investigator in the case, testified that he interviewed the only eyewitness, Jessica Brewington, and that she told him that the stabbing occurred on the tail-end of a New Year's Eve party at the Lylewood Road residence of her parents. She told him that "they were trying to close things up in the garage, lock it up and then go into the house and basically close down the party." She said that the victim "was trying to help her close things down and that he was trying to get [the defendant] to exit the garage area" when she saw the victim "put his hands on [the defendant's] shoulders and then in a sudden movement . . . [the defendant] had stabbed [the victim]." The defendant immediately fled from the garage. Investigator Hodge said that he had interviewed all but four of the 25 people that had attended the New Year's Eve party and that none indicated that there was any hostility between the defendant and the victim during the festivities.

During cross-examination, Investigator Hodge acknowledged that Samantha Brewington told him "that there had been some type of a verbal altercation" between the victim and the defendant. Another witness indicated that "there was some type of banter" between the men, but Investigator Hodge said that it was not clear whether that witness personally observed the interaction or was simply repeating what she had been told. He said that it was unclear whether the witness in question had actually attended the New Year's Eve party. Investigator Hodge said that "[e]very indication that [he] had from [Jessica] Brewington, the eyewitness, was that it was no[t] self-defense." He acknowledged, however, that the victim was more than twice the defendant's size, outweighing him by nearly 130 pounds. He also acknowledged that the defendant had "a red mark on his neck" when photographed after his arrest.

During redirect examination, Investigator Hodge reiterated that the only person who witnessed the stabbing was Jessica Brewington. He said that Jessica Brewington told him that the stabbing consisted of "four quick movements."

The victim's autopsy report established that he suffered "[m]ultiple sharp force injuries" to his neck and head. The report lists eight different stab or incised wounds along with five serious abrasions to the same area.

Frank Waynick testified on behalf of the defendant that he attended the New Year's Eve party at the Brewington residence and that the victim was "[a]cting like he was mad about something" during the evening. Mr. Waynick, who described his relationship with the victim as friendly, said that the victim "had an attitude problem." Mr. Waynick said that he did not see the victim interact with the defendant at all, but he related an encounter during which the victim "grabbed [Mr. Waynick] by [the] collar and jerked [him] up" after Mr. Waynick refused the victim's request that he pick up an empty beer can. Mr. Waynick said that the victim had a reputation for causing trouble when he had been drinking. He said, "He just seemed like when he got to drinking, the more he drank, he would pick somebody out to pick on and he would pick on them." Mr. Waynick recalled that he was the victim's primary target and that the defendant "would have been number two."

During cross-examination, Mr. Waynick said that, to his knowledge, the victim and the defendant met for the first time at the New Year's Eve party. Mr. Waynick said that he never observed the victim's directing his bad attitude toward the defendant.

Brandon Darnell testified that he knew both the defendant and the victim and that he was on friendly terms with both men, although he did not know either of them well. He said that he met the victim for the first time in a pool hall and that the victim picked a fight with him on that evening. Mr. Darnell testified that the victim had a reputation for

being "[h]otheaded." Mr. Darnell said that he attended the New Year's Eve party at the Brewington residence and that he was not drinking that evening. Mr. Darnell said that he saw the victim drinking but did not see the defendant with any alcoholic drink.

Mr. Darnell testified that he saw the victim poke the defendant in the chest, call his name several times, and call him "a false flaggin N word." He insisted that the defendant "kept trying to avoid confrontation" by moving to different parts of the garage where the party was held. He said that the victim continued "basically being ill with [the defendant]; wanting to threaten him; basically like he wanted to fight him."

During cross-examination, Mr. Darnell admitted that he had never actually seen the victim get into a fight and had simply heard in the community that the victim had done so. Mr. Darnell said that he left the Brewington residence at approximately 4:30 a.m. He first learned of the victim's murder from his girlfriend, who approached him as soon as he got home that morning. He said that after learning of the murder, he returned to the Brewington residence for approximately 30 to 35 minutes and then proceeded to the home of Mary Dillard, the victim's paramour. Mr. Darnell acknowledged that he did not actually know Ms. Dillard but claimed that he went to her residence "to give her a hug" and "to show grief."

Sandra Brewington testified that she and her husband gave a New Year's Eve party and that they invited the victim, who was a longtime friend, and the defendant, who was their daughter's boyfriend and the father of their grandson. She said that the victim began consuming alcohol immediately after he arrived at their residence sometime in the late afternoon. In contrast, the defendant only consumed a small amount of wine to ring in the new year. Sandra Brewington testified that the victim had a reputation for being "intimidating" and "sometimes a little overbearing." She said that the victim had started a fight with her husband and with another man named Donnie on two previous occasions.

Sandra Brewington testified that she never observed any physical violence between the defendant and the victim during the party. She said that her daughter made her aware of a problem between the two men and asked her to have her husband speak with the victim because "he's f***** with [the defendant]." She testified that she asked her husband to speak with the victim, and then she went to bed at approximately 12:15 a.m. because she had to work the following day.

During cross-examination, Sandra Brewington testified that she did not witness any interaction between the defendant and the victim. She said that both she and her husband classified the victim as a friend and that he visited their home regularly. She acknowledged that her husband did not actually speak with the victim about her daughter's complaints but

instead decided to "watch [the victim]."

The defendant testified that he knew the victim to be a friend of the Brewingtons but that he and the victim were not friends. He said that when he arrived for the New Year's Eve party, the victim had already consumed some beer. The defendant said that he only drank two glasses of champagne during the course of the evening. The defendant testified that the victim, whom he described as "tall; big; intimidating; scary looking," "picked on" him throughout the evening and "called [him] a n*****, said he'd break [him] in half." The defendant said that he tried to stay away from the victim because he was afraid of him. The defendant recalled that the victim poked him in the chest in "[a] threatening manner; very hard." He said that, on another occasion, the victim ordered him to get out of a chair and "take the long way around" the pool table. The defendant said that the victim continued to consume alcohol throughout the evening and that he was "[v]ery much" intoxicated.

According to the defendant, at some point, all of the partygoers left except him, the victim, and Jessica Brewington. The defendant said that he was sitting near the stereo listening to music, that the victim was sitting at a table, and that Jessica Brewington came over and asked him if he was ready to go inside. The defendant testified that he told Jessica Brewington that he "wanted to listen to the music for a little bit longer, and then [the victim] jumped up and came over to [him]." He said that the victim "put his hands on [the defendant's] shoulders" in a "forceful" manner. According to the defendant, the victim put his thumbs against the defendant's throat, making it difficult for the defendant to breath. The defendant said that he thought he was "going to die." He claimed that he "reached for anything [he] could get [his] hands on" and "started hitting" the victim. He said that he did not know what he had grabbed and that the victim continued to squeeze his neck despite the blows. The defendant said that he "kept hitting" the victim until the victim released him. The defendant testified that he ran away immediately after being released because he was "[s]cared of [the victim]" and believed the victim "was going to get" him. He said that the victim was still standing when he left the garage.

According to the defendant, he ran into the nearby woods and did not come out until he "heard the cops." He claimed that he came out of the woods so that he could "tell them what happened" at the Brewington residence.

During cross-examination, the defendant insisted that the victim, whom he had met on only two or three other occasions, began picking on him for no reason and that "[a]t random times he would . . . come up to [the defendant] and try to pick a fight." The defendant admitted, however, that he had played pool with the victim during the party. He also admitted that he remained in the garage with only the victim and Jessica Brewington

-6-

after all the other guests had gone. He also conceded that he told Jessica Brewington that he wanted to remain in the garage alone with the victim and listen to music. The defendant insisted that although the garage door was open and although the victim was several feet away when he began walking toward him, he could not have escaped the victim. The defendant conceded that there were no tables or shelves near where he stood and maintained that he was able to grab a weapon from thin air.

The transcript of Jessica Brewington's preliminary hearing testimony was introduced by the defendant as an exhibit at the revocation hearing. In that hearing, Jessica Brewington described the encounter between the defendant and the victim:

> [E]verying was winding down and I was gettin[g] ready to put all the food and everything up, and I asked [the defendant] if he was ready to go in; and he just said that he wasn't ready to go in and that he would like to stay in the shop and listen to the radio for a little while. And [the victim] grabbed him; I don't know if [the victim] was tryin[g] to help me get him in the house, but when it happened it happened so fast and I just assumed that [the defendant] had stabbed [the victim].

She said that she did not see the weapon that the defendant used to stab the victim. She testified that the defendant "took off" after stabbing the victim. She said that the victim did not say anything to the defendant before the defendant stabbed him and acknowledged that the victim put his hands on the defendant's shoulders just before the defendant stabbed him.

At the conclusion of the hearing, the trial court concluded that the facts adduced at the hearing did not support the defendant's claim of self-defense. As a result, the court revoked the defendant's probation and ordered that he serve the balance of his sentence in confinement.

In this appeal, the defendant contends that the trial court erred by admitting Jessica Brewington's hearsay statements at the hearing and that the trial court erred by revoking his probation because the evidence established that he acted in self-defense. We consider each claim in turn.

*I. Admission of Testimony*

The defendant contends that the trial court erred by admitting into evidence the statements that Jessica Brewington made to police, claiming that the statements constituted inadmissible hearsay. The State asserts that the trial court committed no error because

reliable hearsay is admissible in a probation revocation proceeding.

Because "the issue in a probation revocation proceeding is not the guilt or innocence of the defendant, the right to confront and cross-examine adverse witnesses is not absolute and may be relaxed under certain circumstances." *State v. Wade*, 863 S.W.2d 406, 407 (Tenn. 1993). Recognizing the need "to preserve the flexible, informal nature of the revocation hearing, which does not require the full panoply of procedural safeguards associated with a criminal trial," *Black v. Romano*, 471 U.S. 606, 613 (1985), courts considering the admissibility of evidence at a probation revocation proceeding have concluded that due process principles rather than the rules of evidence govern, *see Wade*, 863 S.W.2d at 407; *Morrissey v. Brewer*, 408 U.S. 471, 487 (1972). As a result, the trial court determining whether to revoke probation may consider evidence that does not meet the usual evidentiary requirements. *Morrissey*, 408 U.S. at 489. That being said, due process principles require that the probationer be permitted to confront the witnesses against him unless the trial court "specifically finds good cause for not allowing confrontation." *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973).

That said, we note that although the defendant complains that the trial court failed to make a finding that the witness was unavailable, it was the defendant who insisted that Jessica Brewington was unavailable for purposes of the rules of evidence and the defendant who exhibited Jessica Brewington's preliminary hearing testimony to the probation revocation hearing. Thus, the defendant cannot now be heard to complain about the admission of the preliminary hearing transcript. Moreover, even if the trial court erred by admitting Jessica Brewington's statements to Investigator Hodge, that error was harmless given that her statements to the investigator were identical to the testimony she offered at the preliminary hearing. The defendant is not entitled to relief on this issue.

## II. Revocation

The defendant contends that the trial court erred by revoking his probation because the State failed to rebut his claim that he stabbed the victim in self-defense. The State asserts that it was not required to rebut the defendant's claim and that the evidence adduced at the hearing supports the revocation.

The accepted appellate standard of review of a probation revocation is abuse of discretion. *See State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *see also State v. Reams*, 265 S.W.3d 423, 430 (Tenn. Crim. App. 2007). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). The

1989 Sentencing Act expresses a burden of proof for revocation cases: "If the trial judge finds that the defendant has violated the conditions of probation and suspension by a preponderance of the evidence, the trial judge shall have the right by order duly entered upon the minutes of the court to revoke the probation and suspension of sentence. . . ." T.C.A. § 40-35-311(e)(1).

Upon a finding by a preponderance of the evidence that the defendant has violated the conditions of probation, the trial court may revoke the defendant's probation and "[c]ause the defendant to commence the execution of the judgment as originally entered, or otherwise in accordance with § 40-35-310." *Id.*; *see also Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). Following a revocation, "the original judgment so rendered by the trial judge shall be in full force and effect from the date of the revocation of such suspension." *Id.* § 40-35-310. The revoking court may extend the period of probation supervision for a period not to exceed two years. *Id.* § 40-35-308(c).

The evidence adduced at the hearing established that the defendant stabbed the victim multiple times. The defendant claimed that he did not know what he had struck the victim with, asserting that he had groped wildly for something to defend himself while the victim choked him. The trial court concluded that the evidence, particularly Jessica Brewington's account of the offense, did not support the defendant's claims. The trial court, as the trier of fact in a probation revocation hearing, determines the credibility of witnesses. *See generally State v. Mitchell*, 810 S.W.2d 733 (Tenn. Crim. App. 1991); *see also Carver v. State*, 570 S.W.2d 872 (Tenn. Crim. App. 1978). The accredited testimony at the hearing established that the defendant stabbed the victim multiple times, killing him. In consequence, the trial court did not err by revoking the defendant's probation and ordering him to serve the balance of his sentence in confinement.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE