IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 17, 2013

STATE OF TENNESSEE v. JAMES WILLIAM AXFORD, II

Appeal from the Circuit Court for Warren County
No. F12710    Larry B. Stanley, Jr., Judge

No. M2012-01530-CCA-R3-CD - Filed May 8, 2013

In this delayed appeal, the defendant, James William Axford, II, contends that the trial court erred by revoking his probation and ordering that he serve in confinement the originally imposed sentence of three years for his convictions of fraudulently obtaining a controlled substance, evading arrest, identity theft, and aggravated assault. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Tammy H. Womack, McMinnville, Tennessee (on appeal); and Dan Bryant and Trenena Wilcher, Assistant District Public Defenders (at hearing), for the appellant, James William Axford, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Tom Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant pleaded guilty on February 23, 2011, to fraudulently obtaining a controlled substance, two counts of felony evading arrest, identity theft, and aggravated assault, and he received a total effective sentence of three years to be served on probation. On September 14, 2011, a probation violation warrant issued alleging that the defendant had violated the terms of his probation by sexually assaulting a 12-year-old girl.

At the January 11, 2012 revocation hearing, the defendant's probation supervisor, Scott Muncey, testified that the defendant telephoned him on September 6, 2011, and alerted him to an "incident" that had occurred over Labor Day weekend in 2011. According to Mr. Muncey, it was "alleged that [the defendant] had placed his hands on a 12 year old minor causing her to leave the residence in what is believed to be fear." Mr. Muncey said that he filed a probation violation report alleging that the defendant had violated the terms of his probation by engaging in "assaultive, abusive, or threatening or intimidating behavior."

Upon cross-examination, Mr. Muncey acknowledged that the defendant had reported as required and was generally "doing okay" on probation. Mr. Muncey again acknowledged that the defendant had self-reported the incident, testifying, "He informed me that the Sheriff's Department had been out to his trailer, gave a brief synopsis of what had happened and then requested to come in and see me sooner than he was actually scheduled to." Mr. Muncey said that the defendant's "take on the situation was that . . . the victim of the case, ran out of his residence, after he had made a racial slur, to a neighbor's home and she was wielding a knife in apparent fear." The defendant told Mr. Muncey that the victim "apparently became irate at the racial slur and ran across the yard to the neighbor's house and informed the neighbor they needed to call the police that [the defendant] had touched her." He clarified that the defendant denied touching the victim. Mr. Muncey said that he did not believe the defendant's version of events, saying, "I wouldn't assume that a 12 year old girl would arm herself with a knife and then run from the residence saying she needed someone to call the Sheriff's Department." He testified that "[a]fter further investigation in talking with the detective that responded to the phone call there seemed to be enough information" to support the filing of a probation violation report.

Jackson County Sheriff's Department Investigator Mark Micah testified that he responded to a call at approximately 8:00 p.m. on August 30, 2011, that "a minor female subject" had come to a neighbor's house "crying and carrying a large knife" and claiming "that the male subject that she was staying with while her parents were out of town had touched her in a bad location on her body." Investigator Micah said that he "spoke to the people that were there at the residence" as well as the alleged victim, whom he described as "very, very upset." He recalled that when the defendant entered the residence, "this child jumped up and ran crying to another room." He said that the victim was initially reluctant to talk to the investigator and that he was able to get more information from the neighbors. He then confronted the victim with the information he had received, and she told him "that she was inappropriately touched, that they had been watching a movie . . . . that she had told [the defendant] not to come near her. If he did she would stab him with the knife. She also stated that they were watching some kind of pornographic movie." The victim told him "that she ran out of the residence, went to one neighbor's house and no one was home and then she

went to the other neighbor's house on the opposite side" of the defendant's residence. Investigator Micah testified that he recovered the knife from the neighbor.

Upon questioning by the court, Investigator Micah clarified that the victim "stated that [the defendant] had touched her in a bad location on her body, in her vaginal area."

Jane Montgomery, a forensic interviewer at the Upper Cumberland Child Advocacy Center, testified that she interviewed the victim regarding the August 30, 2011 incident at the defendant's residence. Ms. Montgomery summarized the victim's account:

> She was at a trailer that she lived at, which it was my understanding from the child that [the defendant] lived there as well. She and [the defendant] were alone in the trailer watching a movie in his room and at some point during that time he turned on what the child described as, "a nasty movie," and the child described that as, "adults doing bad stuff and they were wearing nothing." He, at that time, asked if he could do those things to her and according to the child he took his hand and touched between her legs, what she referred to as "down there" and what she later identified on the body charts as her vagina. At that point there was a bit of a struggle. The child got up, ran to the kitchen, got a knife, and then ran to a neighbor's and the neighbors called the police and the police came.

The victim reported being "scared" during the incident.

The defendant offered no proof, and at the conclusion of the hearing, the trial court revoked the defendant's probation based upon its finding that the defendant had violated the terms of his probation as alleged in the warrant. The court ordered that the defendant serve the balance of his sentence in confinement.

The accepted appellate standard of review of a probation revocation is abuse of discretion. *See State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *see also State v. Reams*, 265 S.W.3d 423, 430 (Tenn. Crim. App. 2007). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Terry Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). The 1989 Sentencing Act expresses a burden of proof for revocation cases: "If the trial judge finds that the defendant has violated the conditions of probation and suspension

by a preponderance of the evidence, the trial judge shall have the right by order duly entered upon the minutes of the court to revoke the probation and suspension of sentence. . . ." T.C.A. § 40-35-311(e)(1).

Upon a finding by a preponderance of the evidence that the defendant has violated the conditions of probation, the trial court may revoke the defendant's probation and "[c]ause the defendant to commence the execution of the judgment as originally entered, or otherwise in accordance with § 40-35-310." *Id.*; *see also Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). Following a revocation, "the original judgment so rendered by the trial judge shall be in full force and effect from the date of the revocation of such suspension." *Id.* § 40-35-310.

The defendant avers that the trial court erred by admitting hearsay evidence during the revocation hearing. The State contends that reliable hearsay is admissible during probation revocation proceedings. Because "the issue in a probation revocation proceeding is not the guilt or innocence of the defendant, the right to confront and cross-examine adverse witnesses is not absolute and may be relaxed under certain circumstances." *State v. Wade*, 863 S.W.2d 406, 407 (Tenn. 1993). Recognizing the need "to preserve the flexible, informal nature of the revocation hearing, which does not require the full panoply of procedural safeguards associated with a criminal trial," *Black v. Romano*, 471 U.S. 606, 613 (1985), courts considering the admissibility of evidence at a probation revocation proceeding have concluded that due process principles rather than the rules of evidence govern, *see Wade*, 863 S.W.2d at 407; *Morrissey v. Brewer*, 408 U.S. 471, 487 (1972).

Here, the trial court permitted the State's witnesses to recount the victim's version of the offense committed against her by the defendant. The court likewise permitted Mr. Muncey, upon questioning by the defendant, to offer the defendant's out-of-court rendition of the events. The court determined that all of the hearsay testimony was reliable and found, albeit implicitly, that the admission of the testimony did not violate principles of due process. We cannot say that the trial court erred by admitting the testimony. *See State v. Andra Dennis*, No. W2010-00259-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Jackson, Oct. 20, 2010) ("A trial court may admit reliable hearsay evidence in a probation revocation hearing so long as the opposing party is given a fair opportunity to rebut the evidence and the evidence was not 'secured in violation of the United States or Tennessee constitutions.'") (quoting T.C.A. § 40-35-209(b) (Supp. 2009), and citing *Wade*, 863 S.W.2d at 409).

The defendant also contends that the trial court erred by revoking his probation because "there was just not enough credible evidence in the record to sustain a conviction beyond a reasonable doubt" given that "[t]he evidence presented against the defendant is highly circumstantial." We remind the defendant, however, that the State bears the burden

of proving probation violation allegations by a preponderance of the evidence and not beyond a reasonable doubt.[1]  *See* T.C.A. § 40-35-311(e)(1).

Here, the evidence established that the 12-year-old victim arrived at a neighbor's house visibly shaken, wielding a knife, and reporting that the defendant had touched her inappropriately.  The victim repeated the story to Investigator Micah, confirming that the defendant had touched her "in a bad place" after the two watched "some kind of pornographic movie."  Investigator Micah described the victim as "very, very upset."  Ms. Montgomery related that the victim told her that the defendant touched her vagina after asking if he could perform on her the same acts depicted in a pornographic movie.  The victim told Ms. Montgomery that she was scared during the incident, which emotion was confirmed by the victim's running terrified from the residence while wielding a knife.  The defendant's conduct clearly qualified as "assaultive, abusive, or threatening or intimidating behavior," which was strictly prohibited by the terms of his probation.  Under these circumstances, the trial court did not err by revoking the defendant's probation and ordering him to serve the balance of his sentence in confinement.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[1]We also remind the defendant that, even if the burden of proof were beyond a reasonable doubt, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence."  *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).