IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 24, 2019

**STATE OF TENNESSEE v. WILLIAM ROBERT GOODWIN**

**Appeal from the Criminal Court for Knox County
Nos. 106968, 106969, 106970, 107087, 107310, 107311, 107775, 107776
Bobby R. McGee, Judge**

_____

**No. E2018-01683-CCA-R3-CD**

_____

The Defendant-Appellant, William Robert Goodwin, appeals from the order of the Knox County Criminal Court revoking his probation and ordering him to serve the balance of his sentence in confinement. In this appeal, the Defendant concedes that he violated his probation; however, he contends the trial court abused its discretion in ordering confinement because his probation violations were minor, he had established a stable life and work history, and he had compelling family reasons to remain on probation. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Mark E. Stephens, District Public Defender; and Jonathan Harwell, Assistant Public Defender, for the Defendant-Appellant, William Robert Goodwin.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On March 29, 2017, the Defendant entered guilty pleas to burglary, five counts of theft, violation of driver's license law, attempted theft, and criminal trespass, for which he received an effective sentence of six years. On August 9, 2017, following a sentencing hearing, the trial court placed the Defendant on enhanced probation for four years, which was conditioned upon the Defendant's enrollment in a rehabilitation residential treatment program (halfway house). The record shows that on October 4,

2017, a probation violation warrant was filed, alleging that the Defendant had tested positive for tetrahydrocannabinol (THC) and that he was discharged from the halfway house on October 3, 2017, for non-compliance. On October 17, 2017, the Defendant agreed to the probation violation. On November 7, 2017, he was released from jail on his own recognizance and accepted back into the halfway house. On December 12, 2017, an amended probation violation warrant was issued, alleging that the Defendant subsequently failed to notify his probation officer before changing his residence, that his whereabouts were unknown from December 9 to December 10, 2017, that the Defendant had been drinking alcohol on December 9, 2017, and that he was discharged a second time from the halfway house. On March 15, 2018, the Defendant "submitted" to the violation of probation warrant. The trial court then referred the Defendant to the Community Alternatives to Prison Program (CAPP) and the Day Reporting Center (DRC) for recommendations for treatment.

On May 11, 2018, the trial court conducted a probation violation hearing. At the top of the hearing, the State explained that the Defendant had agreed to the violations of probation in the amended warrant and that the parties were present to determine the Defendant's sentence. The State offered into evidence reports from CAPP and DRC, both of which recommended that the Defendant be ordered to serve his sentence in confinement because he was not an appropriate candidate for treatment. In support of its position, the State explained as follows:

> The State would point out that in this case [the Defendant] was on parole when he picked up these charges that he pled guilty to. He completed his TDOC sentence. He came out from TDOC and resolved these cases in May 2017. His parole ended I believe in June. He applied for Enhanced. Enhanced Probation agreed to take him [,] but they wanted him to go through in-patient treatment at Jellinek. He went through that. He was released to Enhanced in August. And the file reflects that his probation-he violated his probation in October by having a positive marijuana screen [,] and he was taken back into-he was living at the halfway house. He was taken back into custody, given another chance. Had to sit for a little while. He goes back to the halfway house [,] and then he has a positive screen again, this time for alcohol in December. A violation of probation was issued, and he did not show up for probation, did not turn himself in. The warrant gets served on him and he came into custody. He submitted to the VOP.

In response, defense counsel clarified that the State misunderstood the violation of probation to which the Defendant had agreed. Defense counsel explained that the Defendant conceded to failing to report as directed by his probation officer; however, he

denied that he was intoxicated on December 10, 2017, as stated in the amended violation warrant. Although a staff member at the halfway house reported that the Defendant was intoxicated, the Defendant was not given a urine test at that time to confirm his condition. Defense counsel said that the Defendant "voluntarily and on his own submitted himself to a drug screen company that has as a part of it an 80 hour look back for a metabolite of ethanol. The results of those tests were all negative for all substances, including alcohol." Defense counsel stated that the Defendant did not immediately turn himself in on the amended violation of probation warrant because he was "compelled to remain out so that he could be with his child over the holidays." Rather than a sentence of confinement, defense counsel argued for probation because the Defendant maintained a stable job and worked to regain parental rights of his daughter.

The Defendant's probation officer, Natasha Davis, testified that she had supervised the Defendant since August 2017. In October 2017, she filed a violation of probation report because the Defendant tested positive for marijuana use. The Defendant turned himself in on the violation of probation warrant, served time in prison, and was released back to the halfway house in November 2017. Officer Davis testified that the Defendant reported to her one time upon his release, and he committed another violation of probation in December 2017. Although the Defendant did not turn himself in, he contacted Officer Davis several times via text message before coming into custody on February 23, 2018. Officer Davis testified that she did not believe that the Defendant was an appropriate candidate for probation. She agreed that she was not present at the halfway house on the day that the Defendant was discharged and that she was not aware of which staff member reported the violation. Even though the Defendant reported to her more than once during his supervision, Officer Davis explained that, per the Public Safety Act, a discharge from the halfway house resulted in a violation of probation.

Another probation officer, Lisa Mooneyham, testified that she worked with Officer Davis and that she spoke to the director of the halfway house on the night that the Defendant was discharged in December 2017. Officer Mooneyham testified that the director told her that the Defendant was discharged because he came in late, "appeared to be drinking," and was arguing with his daughter. Officer Mooneyham also testified that the Defendant left the county without her permission in violation of his probation. Officer Mooneyham confirmed that the director of the halfway house did not personally observe the Defendant on the night that he was discharged. Rather, the house manager reported the incident to the director. Officer Mooneyham also explained that the Defendant left the county while on probation to attend a child support court date in Chattanooga. Although the Defendant received permission from the halfway house to leave the county, he did not get permission from Officer Mooneyham. Officer Mooneyham had "bent over backward to work with" the Defendant, and she no longer

wanted to supervise him because "he just makes decisions without consulting us and they're bad decisions each time, but he makes that decision to do that."

Portions of the report from CAPP were read into evidence by a representative, who testified that the Defendant was not appropriate for the program. The relevant portion of the report provided as follows:

[The Defendant] is not appropriate for placement on CAPP-on the CAPP program. CAPP is concerned that his past criminal history demonstrated an inability on his part to be successful in prior placements, including probation and parole. He's a multi county and multi state offender. He has continued his drug use even after treatment at both Steps in 2013 and Jellinek 2017. His criminal history also shows a past possession of weapons with intent to go armed 1997 conviction and domestic battery conviction resulting in a protective order against him in 2008. CAPP believes [the Defendant] has exhausted all available treatment options.

The Defendant testified that he was a flooring installer, a drug addict, and was under the influence of drugs when he committed the offenses. He explained that his daughter was born fourteen days prior to his July 2015 arrest and that, upon his release from prison, she was in state custody. He detailed his efforts to regain custody of his daughter, and a letter from an attorney memorializing the same was admitted into evidence. The Defendant also admitted to violating probation by using marijuana in October 2017, for which he served approximately 30 days in jail. The Defendant then explained the circumstances of the December 2017 discharge from the halfway house. He said that he had gone to dinner with his older daughter that night, and, once they returned to the halfway house, they got into an argument about personal issues. The house manager, Jason Leach, mistakenly thought that the Defendant was intoxicated, but the Defendant testified that he had not had anything to drink that night. The Defendant asked the house manager to breathalyze him, but he refused. The Defendant agreed that he was discharged from the halfway house that evening and that he stayed with his daughter that night.

The Defendant testified that he called his probation officer the following morning and became aware that a probation violation had been filed against him. Three days later, on December 13, 2017, the Defendant went to a drug lab to have drug tests done. The Defendant said the result of the 80-hour lookback test for the presence of ethyl alcohol was negative. A copy of the test results was admitted into evidence over the State's objection. The test results showed that the Defendant was negative for both alcohol and drugs. The Defendant acknowledged nevertheless that he did not turn himself in to authorities until February 2018. He explained that his attorney was unsuccessful at

- 4 -

"working something out" and that he wanted to spend the holidays with his daughters. The Defendant agreed that he had a "horrible record," but he insisted that he was going to "stay clean" for his daughters. On cross-examination, the State questioned the Defendant about his children, prior charges, and the circumstances leading up to the charges filed in the instant case. The Defendant testified that the reason he used marijuana in October was because he found out that his "wife was pregnant by another man, and [he] had a relapse."

Although the trial court determined that the Defendant had indeed violated his probation, the trial court was concerned with the lack of direct proof supporting the Defendant's December 10, 2017 discharge from the halfway house. Before imposing sentence, the trial court set the matter for another hearing for the State to offer testimony from the house manager of the halfway house. On June 22, 2018, Jason Leach, the house manager of the halfway house at the time the Defendant was discharged, testified that on December 10, 2017, he was on duty when he observed the Defendant's daughter trying to help the Defendant inside. The house manager described the Defendant's appearance as, "Not good. Just inebriated." He stated that the Defendant's daughter had to help the Defendant through the door, that the Defendant could not stand up on his own, and that the Defendant smelled of alcohol. The house manager told the Defendant's daughter that she could not be there because she was female and that the Defendant could not be there in his condition. The Defendant's daughter and her boyfriend then helped the Defendant out of the house and back to her car. The house manager called the assistant director of the halfway house and advised him of the Defendant's circumstances. The house manager did not administer a breathalyzer or a urine test to the Defendant because the Defendant "couldn't function," and "it was obvious--very obvious that he was intoxicated."

At the final setting, on August 2, 2018, the parties argued their respective positions to the trial court. The Defendant also admitted into evidence several exhibits including a photograph of him and his three-year-old daughter, a copy of a juvenile court docket setting for a child custody matter, a letter from a child custody official establishing her willingness to work with the Defendant along with the termination of parental rights procedures, copies of paychecks establishing the Defendant's work history during the non-reporting period; a May 24, 2018 letter from a drug recovery specialist noting that the Defendant needed to be in a halfway house and complete treatment, and a July 3 letter from the Steps Program noting that a bed was available and agreeing to accept the Defendant into their program immediately.

By written order on September 13, 2018, the trial court denied the Defendant's request for further alternative sentencing and ordered him to serve the balance of his sentence in confinement. It is from this order that the Defendant now appeals.

# ANALYSIS

On appeal, the Defendant contends that the trial court erred in ordering confinement because his violations were minor, he had established a stable life and was working productively, and he gave compelling family reasons for remaining on probation. Given the trial court's failure to acknowledge any of the evidence put forth in support of alternative sentencing, the Defendant argues that the trial court did not recognize that "the determination of the proper consequence of a probation violation embodies a separate exercise of discretion." State v. Patsy McCoy, No. M2011-00006-CCA-R3-CD, 2011 WL 6916227, at *3 (Tenn. Crim. App. Dec. 28, 2011) (citing State v. Hunter, 1 S.W.3d 643, 647 (Tenn. 1999) and State v. Reams, 265 S.W.3d 423, 430 (Tenn. Crim. App. 2007)). In any event, the Defendant insists that the record supports imposition of an alternative sentence and that the trial court's order of confinement was arbitrary and unreasonable. The State contends that the trial court's order of confinement was proper.

In resolving the question before us, we are bound by the following well-established law. When a trial court finds by a preponderance of the evidence that the defendant has violated the conditions of probation, the trial court may revoke the probation and order the defendant to serve the judgment as originally entered. Tenn. Code Ann. § 40-35-311(e)(1)(A). Moreover, once the trial court decides to revoke a defendant's probation, it retains discretionary authority to (1) order confinement; (2) order the sentence into execution as initially entered; (3) return the defendant to probation on modified conditions as necessary; or (4) extend the probationary period by up to two years. Hunter, 1 S.W.3d at 646-47; State v. Larry Lee Robertson, No. M2012-02128-CCA-R3-CD, 2013 WL 1136588, at *2 (Tenn. Crim. App. Mar. 19, 2013); State v. Christopher Burress, No. E2012-00861-CCA-R3-CD, 2013 WL 1097809, at *6 (Tenn. Crim. App. Mar. 18, 2013); see also Tenn. Code Ann. §§ 40-35-308, -310, -311 (2012). There is no requirement that the trial court consider other sentencing options when revoking a defendant's probation. State v. George Vincent Ware, No. E2010-00141-CCA-R3-CD, 2010 WL 3448057, at *3 (Tenn. Crim. App. Sept. 1, 2010). The judgment of the trial court will not be disturbed on appeal unless it appears that there has been an abuse of discretion so that the record contains no substantial evidence to support the conclusion of the trial judge. State v. Leach, 914 S.W.2d 104, 106-07 (Tenn. Crim. App. 1995). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party. State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010); State v. Jordan, 325 S.W.3d 1, 38-40 (Tenn. 2010).

The Defendant is aggrieved in large part because he believes the trial court failed to evaluate the entire set of facts presented in this case. Our review of the record, however, shows that the trial court was not unsympathetic to the Defendant's circumstances as a reforming drug addict. Shortly after being placed on enhanced probation, the Defendant violated his probation for drug use and was discharged from the halfway house. Although he served 30 days in jail, he was given another opportunity to serve his sentence on enhanced probation. Almost a month after he was released, the Defendant was discharged again from the halfway house based on his alcohol use. The Defendant was arrested, submitted to the technical violations, and a hearing was held to determine his sentence. At the hearing, CAPP, DRC, and his supervisory probation officer recommended that the Defendant be ordered to complete his sentence in confinement. Rather than hastily ordering confinement based upon this and other technical violations to which the Defendant had agreed, the trial court was concerned with the degree of proof supporting the Defendant's second discharge from the halfway house and reset the matter. Between hearing dates, the trial court also encouraged the parties to seek out recommendations from other treatment providers who were willing to accept the Defendant. The house manager eventually testified that on the night of the second discharge, the Defendant was so intoxicated he was unable to stand. Although the Defendant contested this aspect of the probation violation with an independent lab test, the testimony of the house manager was accredited by the trial court. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991) (the trial court determines the credibility of the witnesses in a probation revocation hearing). The trial court further determined that the Defendant's "argument that he deserves another placement on alternative sentencing because of a false report that he was intoxicated [was] not supported by the evidence."

We recognize, as noted by the Defendant, that in its order the trial court did not reference any of the evidence supporting the Defendant's efforts to be a father and regain custody of his daughter or his attempt to become a productive citizen in the community. We further agree with the fact that, by the time of the sentencing hearing, the Defendant had served a significant amount of jail-time relative to the type of violation that had occurred. However, we are simply unable to conclude that the trial court's failure to explicitly acknowledge these factors amounts to an abuse of discretion. Ordering the Defendant to serve his sentences in confinement was clearly one of the options available to the trial court upon finding that a violation occurred, McCoy, 2011 WL 6916227, at *3, and the record fully supports the trial court's order of confinement. See State v. Juan Manuel Coronado, II, No. E2010-01058-CCA-R3-CD, 2011 WL 704543, at *3 (Tenn. Crim. App. Mar. 1, 2011) (cautioning that an accused, already on probation, is not entitled to a second grant of probation or another form of alternative sentencing). Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based upon the above authority, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE