### STATE of Tennessee

v.

### James Lamont REAMS.

Court of Criminal Appeals of Tennessee, at Nashville.

Assigned on Briefs May 15, 2007.

Oct. 2, 2007.

Ross E. Alderman, District Public Defender; and Emma Rae Tennent, Assistant Public Defender, for the appellant, James Lamont Reams.

Robert E. Cooper, Jr., Attorney General & Reporter; Preston Shipp, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

The defendant, James Lamont Reams, pleaded guilty to two counts of attempted aggravated sexual battery, *see* T.C.A. §§ 39–12–101, –13–504 (2006), Class C felonies, and one count of sexual battery, *see id.* § 39–13–505, a Class E felony. The court sentenced him to a total effective sentence of eight years' probation and ordered "sex offender treatment" as a condition of probation. The defendant began attending a sex offender treatment program but was terminated from the program after several months. A probation violation warrant was served; the trial court revoked the defendant's probation and ordered him to serve his sentence in confinement. The defendant appeals, claiming that the trial court erred in revoking his probation because (1) the defendant was not notified that he would have to admit his guilt to be successful in the sex offender treatment program; (2) the treatment provider demanded that the defendant admit "to the treatment provider's personal version of the offense that exceeded the scope of the defendant's guilty plea"; and (3) the defendant complied with the objective standards of the treatment program. After a thorough review of the record and applicable law, we affirm the trial court's order.

The defendant pleaded guilty on September 6, 2005, to the sex offenses. At the guilty plea hearing, the defendant agreed to the following facts as stated by the prosecutor.

Had this matter proceeded to trial, the state would adduced the testimony of the alleged victim [M.A.][1] who was, I believe, twelve years of age at the time. But during the time period that [the defendant] resided on and off in [M.A.'s] mother's residence located here in Nashville, Davidson County, that there were a variety of sexual encounters between [M.A.] and the defendant that were documented, described in her forensic interview. [M.A.] would have been prepared to testify that on multiple occasions the defendant fondled her buttocks, her breasts, and engaged in penile/genital contact with her, that those occurred in a variety of locations within her residence.

[The defendant] was interviewed and adamantly denied that he had engaged in any sexual activity with the victim. The Court will recall based on the 412 Hearings that were conducted that [M.A.] had a medical examination that indicated that there was penetration of her genitals based upon changes in her genital status between when she was ten years or nine years of age in a prior medical examination and based on her subsequent disclosures. But, that in the interim, [another defendant] has also engaged in similar types of penile/genital contact and intercourse and penetration with her.

Also on September 6, 2005, the trial court sentenced the defendant to an effective eight years' probation on the condition that he "attend sex offender treatment." In addition, the defendant signed a "Probation Order," stating that he would comply with certain rules, namely the "Standard Division III Rules." An addendum to this order, which the defendant also signed, stated that he would "Attend and Complete the following treatment or counseling Psychosexual Evaluation" and "Sex Offender Registry." On September 14, 2005, the defendant signed another "Probation Order" which listed rules of probation including:

1. I will obey the laws of the United States, or any State in which I may be, as well as any municipal ordinances.

---

1. We will refer to the victim by her initials.

2. I will report all arrests, including traffic violations immediately, regardless of the outcome, to my Probation Officer.

8. I will not use intoxicants (beer, whiskey, wine, etc.) of any kind to excess, or use or have in my possession narcotic drugs or marijuana.

12. I will abide by the Board of Probation and Parole *Sex Offender Directives.*

In addition, the defendant signed the "Sex Offender Directives," which listed rules such as:

3. I will attend, participate in, and pay for treatment and/or counseling with an approved treatment provider as deemed necessary by the Parole Board, the Sentencing Court, or my Officer, per [Tennessee Code Annotated section] 39–13–706. I will continue i[n] such treatment as instructed for the duration of supervision unless my treatment provider, in consultation with my Officer, instructs me in writing that I have satisfactorily completed treatment.

4. I will not use or possess any alcohol or other mind-altering substance, except pursuant to a licensed physician's prescriptions.

On March 31, 2006, the State filed a probation violation warrant and alleged that the defendant violated the first probation rule by being arrested for driving on a suspended license and the third sex offender directive by being "discharged from sex offender treatment, due to unsatisfactory participation."

The trial court held a revocation hearing on May 10, 2006. The defendant's probation officer, Terrance Bohanan, testified that the probation officers and treatment providers review probation rules, Division III rules, and Sex Offender Directives with defendants on several occasions. He testified that the defendants are required to sign them, which the defendant did in this case.

Mr. Bohanan filed the probation violation warrant because the defendant was arrested for driving on a suspended license and was discharged from sex offender treatment. The defendant self-reported the arrest to his treatment provider and to Mr. Bohanan on the same day of the arrest. The defendant also informed Mr. Bohanan of the conviction which occurred at a later date.

Mr. Bohanan testified that the defendant began sex offender treatment supervised by Juanita Gamash and John Brogden in October 2005. He testified that the defendant was subjected to two polygraph examinations as part of the defendant's treatment, and the results revealed that the defendant had drunk alcohol. Mr. Bohanan did not review the results with the defendant; however, the treatment providers were to do that. Mr. Bohanan did not confront the defendant about the alcohol use but stated that the defendant must report that behavior because it impairs judgment and could cause a defendant to reoffend. Mr. Bohanan further testified that a defendant's truthfulness is an important factor in being able to monitor probationers effectively. Mr. Bohanan received information from the treatment providers that the defendant was discharged from treatment on March 26, 2006, for unsatisfactory participation.

On cross-examination, Mr. Bohanan stated that one condition was to "attend, participate in, and pay for" a state-approved sex offender treatment program, and he was unaware if another state-approved program would accept the defendant. Mr. Bohanan testified that the defendant was monitored via Global Positioning System (GPS) tracking, and his movements complied with probation requirements. The defendant remained employed, and although he was behind

paying his probation fees, he was attempting to do so. In addition, the defendant informed Mr. Bohanan, as he was required to do, that a minor child moved into his mother's residence where he was living, and Mr. Bohanan and the defendant arranged for an alternative living situation. Mr. Bohanan did not include alcohol use in his violation warrant because he assumed that the sex offender treatment program would address the issue and refer him to Alcoholics Anonymous (AA).

John Brogden, the coordinator of Pretreatment Services for the Associates for Sexual Assault Prevention, testified that he had treated sex offenders for 27 years. His program is state approved. The defendant began treatment in his program on October 18, 2005. Mr. Brogden conducted the initial intake evaluation. The defendant admitted to drinking alcohol two days before the intake evaluation at the program, and he also stated that he had a history of ingesting cocaine and marijuana and did so during the time period in which the current offenses occurred. During the intake evaluation, the defendant denied penetrating the victim and other claims contained in the victim's statement, and he stated that M.A. initiated the sexual contact by grabbing his penis.

After the evaluation, Mr. Brogden developed goals for the defendant's treatment and placed him in group therapy, level two of the program, hoping it would encourage honesty and accountability from the defendant. Ms. Gamash supervised the defendant during level two. Mr. Brogden testified, "You can't really work on a problem

until you own the problem." Mr. Brogden testified in level one, the pretreatment phase of the program, three goals were to be met.[2] The first goal in the treatment of sex offenders is having them take responsibility for the offense. To meet the second goal, the treatment provider obtains a credible sexual history, including undetected crimes or other problems and attitudes which may have contributed to the instant criminal behavior. Third, the defendants must be able to follow the rules of probation. Mr. Brogden felt, at first, that the defendant would take responsibility for his actions sooner if he began in group therapy, level two.

Mr. Brogden testified that one module of treatment was "denial and dishonesty" and that the defendant denied "significant portions" of the victim's statement. Mr. Brogden explained that in treatment, the defendant must admit the instant offense and then "move on to other areas [the defendant] can accept." He testified that when offenders admit the truth, they become more amenable to treatment. Mr. Brogden further testified that an offender's constantly blaming the victim for his behavior emotionally abuses the victim because he or she is "cross-examined in the community."

Mr. Brogden testified, we discern, that if certain modules[3] are not completed, then treatment providers cannot develop the next module[4] in treatment, the "relapse prevention module." This module is the realistic plan to help convicted sex offenders avoid repeating sexually deviant behavior.

2. We discern from the record that there are various levels of treatment within the program. The different levels contain certain modules, and particular goals must be met within the modules.

3. The record is unclear as to what level of the program this occurs or what levels must be completed.

4. Again, the record is unclear as to what level this module corresponds.

Mr. Brogden testified that the defendant showed "victim stance positions" in that he would diminish his criminal liability, blame the victim for the behavior, attempt to relitigate his case in treatment, and only concede "certain things" when "pressed." The defendant never reached the point where the relapse prevention plan could be developed and implemented. Mr. Brogden testified, "[The defendant] persisted in his denial of certain important sexual behaviors that he committed, and also, his intent behind the—that support the behavior. And he was dragging the group down." Thus, to address the honesty issue, Ms. Gamash moved the defendant from group therapy down to level one, pretreatment. Mr. Brogden testified that if a defendant does not complete level one within three months, then he or she was not accepted into the program.

As part of treatment, the defendant must submit to polygraph examinations to facilitate honesty, thus, advancing treatment. Mr. Brogden testified that the defendant stated information during the polygraph examinations that was different from or inconsistent with information that he provided during his therapy sessions. For example, he had never said in therapy that he asked M.A. to touch his penis, and he revealed this verbal request during a polygraph examination. The defendant also stated in therapy that he had sexual fantasies about M.A., but during the polygraph examination, he stated, according to Mr. Brodgen, "that his sexual thoughts and fantasies had always been about females who were approximately his own age." Moreover, the defendant revealed during an examination that M.A. first touched him, provoking the fantasies about her thereafter; he had never fantasized about her prior to the incident. Mr. Brogden further testified that the defendant was inconsistent with another incident of touching in that he changed the setting to the bathroom. Also, the defendant denied any "penile/genital" contact with M.A.

In addition, the defendant stated in his intake evaluation that he had a history of ingesting drugs, including the time frame of the current offenses; however, during his polygraph examination, he denied ever having ingested illegal drugs prior to his conviction. Furthermore, the defendant admitted during a polygraph examination that he had consumed six to nine beers since being placed on probation in September 2005 and that he intentionally kept this information from his probation officer because it was a violation of the rules of probation. Mr. Brodgen testified that dishonesty signaled a "high risk" person. He testified that honesty regarding drug and alcohol usage is necessary because drugs and alcohol are "powerful disinhibitors to deviant sexual behavior and violent behavior towards people."

When Mr. Brogden confronted the defendant about these various inconsistencies, the defendant was "befuddled and became very vague and kind of shrugged it off." The defendant also claimed that the polygraph examiner "got it wrong."

Mr. Brogden further testified that he cannot form a realistic relapse prevention program for a defendant who is deceptive about the fundamentals. After confronting the defendant with the inconsistencies which were revealed in his second polygraph examination, Mr. Brogden informed the defendant that he would discharge him for lying about what he had done, and he gave the defendant the weekend to change his behavior. However, the homework assignment the defendant turned in after this warning stated "the same thing he told [the polygraph examiner]." Thus, Mr. Brogden discharged him from treatment. Mr. Brogden believed that the defendant was dishonest and that his behaviors, in

essence, elevated the risk to the community. In Mr. Brogden's opinion, the defendant had not advanced in meeting the treatment program's goals, and he felt that further treatment would not change the defendant's attitude.

On cross-examination, Mr. Brogden testified that the defendant must admit to 100 percent of the elements of the offenses described by the victim to complete the "denial and dishonesty module." He further testified that any discrepancy is resolved by polygraph examinations, and treatment providers conclude in "a variety of ways" whether the defendants complete this goal. Mr. Brogden was aware that the defendant did not plead guilty to rape of a child, but he testified that he believed the defendant raped M.A. Mr. Brogden further testified that he warned the defendant that if he did not admit to raping M.A., then he would discharge the defendant from the program. Mr. Brogden formed his opinion that the defendant was lying from observing the defendant and reading the results of the polygraph examinations.

Mr. Brogden also testified that he did not have a level one group when the defendant was first admitted into the program. He created the group for defendants who were being dishonest, so they would not hinder the honest defendants who were progressing in treatment. He explained that defendants must pass level one in three months, or they could not be admitted to level two. He further testified that across the nation treatment levels are combined. Mr. Brogden thought the defendant would complete level one quickly; however, after five weeks at level one, he terminated the defendant from the program.

Mr. Brogden also testified that the polygraph report did not reveal the exact dates on which the defendant drank beer and that the alcohol consumption could have occurred prior to his initial evaluation in October 2005. Mr. Brogden did not refer the defendant to drug or alcohol treatment.

Mr. Brogden testified that Sex Offender Directives require defendants to "attend, participate in, and pay for" treatment, that the defendant's attendance "was good, all in all," that he participated by turning in a homework assignment and confronting another defendant about this defendant's behavior, and that the defendant was paying for treatment. However, the defendant was terminated because he failed to give "a reliable statement of responsibility," which is not a directive.

On redirect examination, Mr. Brogden testified that the defendant initially denied any contact with the victim to police. At the plea hearing, the defendant agreed with facts more in line with the victim's statement than to his subsequent version of events. Mr. Brogden testified that he dealt with deception from defendants frequently during his approximate 30 years treating sex offenders. He also stated that the goal of treatment is for the defendant "[t]o engage substantially in-in the process of reducing risk and making the community safer and making amends to the victim." In his opinion, the defendant failed to do this. The first step in treatment was to accept responsibility for one's own actions.

The trial court questioned Mr. Brogden, and he testified that the defendant first tried to relitigate his case during treatment and that the defendant denied significant portions of the victim's statement. The goal was to get the defendant to accept the truth about his behavior, but he continued to blame the victim despite what charge they were discussing, alleging that she was the aggressor.

The defendant recalled Mr. Bohanan, and he testified that the defendant told him of the ultimatum from Mr. Brogden, and Mr. Bohanan told the defendant to tell the truth. Mr. Bohanan testified the he did not personally know the truth of what happened.

The defendant then submitted a letter confirming his employment and a letter from another State-approved sex offender treatment provider stating the program would accept the defendant if the trial court reinstated him to probation.

The trial court found that the defendant had been arrested for driving on a suspended license and stated, essentially, that this alone would not be enough for a violation. The court also found that because the defendant was "bogging down the group because he would not own up to his problem," he was placed in a different level of the treatment program. Here, the defendant continued to deny "significant portions to accept the truth of his behavior." "[H]e kept blaming the victim, who is a young child, and that it was just not consistent and his own statements were not consistent." The court found that Mr. Brogden thought the defendant dishonest and "a high risk." Mr. Brogden's concern with the defendant's honesty made him doubt "whether or not [the defendant] would comply with treatment."

The trial court also found that the facts of the current case aligned with *State v. Joe Shelton Berry*, M2004–03052–CCA–R3–CD, 2005 WL 2438390 (Tenn.Crim. App., Nashville, Sept. 27, 2005), instead of *State v. William A. Marshall*, M2001–02954–CCA–R3–CD, 2002 WL 31370461 (Tenn.Crim.App., Nashville, Oct. 14, 2002). Thus, based on *Joe Shelton Berry*, and not using the polygraph evidence in the court's decision, the court found that the defendant violated the conditions of his proba-

tion and ordered him to serve his sentence in confinement.

The defendant filed a timely notice of appeal, and on appeal, he claims that the trial court erred in revoking his probation because (1) the defendant was not notified that he would have to admit his guilt to be successful in the sex offender treatment program; (2) the treatment provider demanded that the defendant admit "to the treatment provider's personal version of the offense that exceeded the scope of the defendant's guilty plea"; and (3) the defendant complied with the objective standards of the treatment program. We disagree with the defendant and affirm the trial court's order.

■■■ The standard of review upon appeal of an order revoking probation is the abuse of discretion standard. *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn.1991). For an abuse of discretion to occur, the reviewing court must find that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the terms of probation has occurred. *Id.; State v. Delp*, 614 S.W.2d 395, 398 (Tenn.Crim.App.1980). The trial court is required only to find that the violation of probation occurred by a preponderance of the evidence. T.C.A. § 40–35–311(e) (2006). Upon finding a violation, the trial court is vested with the statutory authority to "revoke the probation and suspension of sentence and cause the defendant to commence the execution of the judgment as originally entered." *Id.* Furthermore, when probation is revoked, "the original judgment so rendered by the trial judge shall be in full force and effect from the date of the revocation of such suspension." *Id.* § 40–35–310. The trial judge retains the discretionary authority to order the defendant to serve the original sentence. *See State v. Duke*, 902 S.W.2d 424, 427 (Tenn.Crim.App.1995).

In 1996, the legislature enacted the "Tennessee Standardized Treatment Program for Sex Offenders" and established the sex offender treatment board, which was charged with the responsibility of developing "guidelines and standards for a system of programs for the treatment of sex offenders which can be utilized by offenders who are placed on probation." T.C.A. § 39–13–704(d)(2) (2006). When a defendant who is accused of committing one or more specified sex offenses seeks probation or other form of alternative sentence, the trial court must obtain an evaluation of the defendant. *Id.* § 39–13–705(a). "If the court grants probation or alternative sentencing, any plan of treatment recommended by such evaluation shall be a condition of the probation or alternative sentencing." *Id.* § 39–13–705(b). The treatment described in Code section 39–13–705(b) is part of a standardized program in Tennessee to evaluate, identify, treat, and monitor sex offenders. *Id.* §§ 39–13–701, –702 (2006). The legislative intent in creating the program is

> so that offenders will curtail recidivistic behavior, and so that the protection of victims and potential victims will be enhanced. The general assembly recognizes that some sex offenders cannot or will not respond to treatment and that, in creating the program ..., the general assembly does not intend to imply that all sex offenders can be successful in treatment.

*Id.* § 39–13–702(b).

#### I. Notice of Admitting Guilt

■ The defendant claims that the trial court erred revoking his probation because he was not notified that he would have to admit his guilt to be successful in the sex offender treatment program. The defendant did not complain of lack of notice at the probation revocation hearing; he raised the issue the first time on appeal. An issue raised for the first time on appeal is waived. *See State v. Alvarado,* 961 S.W.2d 136, 153 (Tenn.Crim.App.1996).

#### II. Refusal to Admit to Facts Outside of the Conviction Offense

■ The defendant argues that the trial court erred in revoking his probation because Mr. Brogden demanded that the defendant admit to Mr. Brogden's "personal version of the offense that exceeded the scope of the defendant's guilty plea." At one point during cross-examination, Mr. Brogden testified that he believed the truth to be, based on the polygraph examinations and observing the defendant, that the defendant raped M.A. He explained that the first step in treatment was to admit to 100 percent of the elements of the offense and then "move on to other areas [the defendant] can accept." Mr. Brogden also testified that he warned the defendant that if he did not admit to the rape, then he would discharge the defendant from treatment.

Initially, we note that due process concerns are raised when probation is revoked because a treatment provider discharged a defendant from treatment based upon the defendant's refusal to admit to offenses in addition to the conviction offense. We have strong reservations about relying on a treatment provider's intuitive conclusions regarding a defendant's guilt of a greater offense than that of which he was convicted, even if the greater offense was fostered by the victim's statements.[5]

However, in this case, Mr. Brogden also testified to instances that bespeak the de-

---

5. The record is devoid of the victim's actual statement and the results of the polygraph examinations. The record fails to inform us whether either source or some other unidentified source provides a reliable indication that the defendant actually penetrated the victim.

fendant's dishonesty, including the circumstances surrounding the attempted aggravated sexual batteries and sexual battery to which the defendant pleaded guilty, and the record factually supports that dishonesty is inimical to treatment. For example, the defendant agreed to the facts as stated by the prosecutor at the plea submission hearing. The prosecutor stated, "[M.A.] would have been prepared to testify that on multiple occasions the defendant fondled her buttocks, her breasts, and engaged in penile/genital contact with her." Yet, during treatment, the defendant denied any "penile/genital" contact. In addition, according to Mr. Brogden's testimony at the revocation hearing, the defendant told conflicting statements regarding his sexual fantasies about M.A.; he changed his story regarding whether or not he asked M.A. to touch his penis; he changed locations of one of the touching incidents; and he was inconsistent in his statements regarding drug and alcohol usage. Furthermore, the defendant never completed the first step in the program, although Mr. Brogden did testify that he participated by turning in homework and confronting another defendant.

Moreover, Mr. Brogden testified in response to questions from the trial court that the defendant attempted to relitigate his case during treatment, that he held his treatment group back, and that he continued to blame the victim for his behavior regardless of what offense they discussed, rape or sexual battery.

Thus, as the trial court essentially found, the defendant was discharged for more than refusing to admit to Mr. Brogden's "personal version of the offense that exceeded the scope of the defendant's guilty plea." Mr. Brogden felt that the defendant's dishonesty regarding other areas hindered his overall progression in the treatment program, he held back the

treatment group, and he continued to blame the victim. The defendant's inconsistencies are "blameworthy failure[s] at treatment." *See State v. Jackie Lee Holliman*, M2005–02139–CCA–R3–CD, slip op. at 10 (Tenn.Crim.App., Nashville, Feb. 5, 2007) (distinguishing *Marshall* and *Berry* ). To be sure, the defendant also admitted to violating probation by being convicted of driving on a suspended license. *See State v. Roger Alan Lawson*, E2005–01388–CCA–R3–CD, slip op. at 3, 2006 WL 721305 (Tenn.Crim.App., Knoxville, Mar. 22, 2006) (affirming revocation of probation because defendant admitted that he violated probation by receiving driving on a suspended license charge regardless of his "substantial compliance with the imposed conditions of probation," including completing sexual offender counseling, "and the circumstances offered in mitigation for his conduct"). Therefore, we hold that the trial court did not abuse its discretion in revoking the defendant's probation.

### III. Compliance with Treatment Program's Objective Standards

The defendant contends that the trial court erred in revoking his probation because the defendant complied with the objective standards of the treatment program. At the revocation hearing and on appeal, the defendant claims that his case falls under *State v. William A. Marshall*, M2001–02954–CCA–R3–CD, 2002 WL 31370461 (Tenn.Crim.App., Nashville, Oct. 14, 2002), and the State argues that *State v. Joe Shelton Berry*, M2004–03052–CCA–R3–CD, 2005 WL 2438390 (Tenn.Crim.App., Nashville, Sept. 27, 2005), controls.

In *William A. Marshall*, which decided the meaning of "complete" in the context of a specific sex offender treatment program, this court recognized that the particular "task-based" program "had no finite

time frame." *William A. Marshall,* slip op. at 8. The treatment providers failed to inform the defendant what was required of him to complete the program until it was too late; they kept moving the "goal-line." *Id.,* slip op. at 8–9. In addition, although Marshall missed only one session, paid all fees, and completed all assignments in all ten modules of the program, the treatment providers "subjectively determined that [Marshall] had not sincerely assimilated the treatment dogma." *Id.,* slip op. at 9. This court decided that because the general assembly did not intend "that all sex offenders can be successful in treatment," *see* T.C.A. § 39–13–702(b), Marshall "completed" his program "by fulfilling all of the objective standards and by cooperatively participating during a substantial portion of the treatment period . . . despite lapses in his attitude which may in part be understood as frustration with the failure to avail to himself useful information about the program's duration and requirements." *Id.*

In *Joe Shelton Berry,* Berry was punctual and attended every class; however, "he made little progress in the program and was very deceptive about his conviction." *Joe Shelton Berry,* slip op. at 2. Thus, he was discharged from the program "because he did not fully participate in the program and was holding the rest of the group back." *Id.* This court discussed *William A. Marshall* and pointed out that Berry did not participate positively as had Marshall. *Id.,* slip op. at 4. Berry "did not fulfill the objective standards of his treatment program by his lack of candor, lackadaisical attitude, and inadequate participation." *Id.* Thus, this court upheld the revocation of probation. *Id.; see also Jackie Lee Holliman,* slip op. at 10 (harmonizing *Berry* with *Marshall*).

Here, the defendant attended his treatment classes; participated as far as turning in a homework assignment and confronting another defendant, who also attended treatment; and paid for treatment, although he was behind on his payments. The defendant started treatment in group therapy; however, Mr. Brogden demoted him to "pretreatment" because he was holding the group back with his dishonesty. This is similar to the situation in *Joe Shelton Berry.* Furthermore, Mr. Brogden testified, and the trial court in essence credited this testimony by revoking probation, that the defendant could not satisfy the first step of treatment because of his dishonesty in many areas. This is different than Marshall completing all ten modules of treatment. Thus, the trial court did not abuse its discretion in revoking the defendant's probation. *See Joe Shelton Berry,* slip op. at 3–4; *see also Jackie Lee Holliman,* slip op. at 10 (affirming revocation of probation where defendant was discharged from first stage of treatment and record contained no evidence that the defendant had completed any objective portion of his treatment program).