IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2020

## STATE OF TENNESSEE v. JARVIS TYVON MORGAN

**Appeal from the Criminal Court for Knox County**
**No. 108365     G. Scott Green, Judge**

### No. E2019-02027-CCA-R3-CD

Aggrieved of the Knox County Criminal Court's revocation of the sentence of probation imposed for his 2016 guilty-pleaded conviction of aggravated assault, the defendant, Jarvis Tyvon Morgan, appeals. He argues that the trial court deprived him of due process by basing its decision on a ground not alleged in the violation warrant. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Cameron Bell, Knoxville, Tennessee, for the appellant, Jarvis Tyvon Morgan.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Molly Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Having been charged by information with one count of aggravated assault, the defendant pleaded guilty as charged on June 27, 2016, in exchange for a Range II, 10-year sentence to be served as one year of incarceration followed by probation. On August 27, 2019, a probation violation warrant issued, alleging that the defendant violated the terms of his probation by committing "the new offense of Domestic Assault" on August 16, 2019, and by acting

> in an assaultive, abusive, threatening[,] and intimidating
> manner by punching the victim in the head approximately 30
> times with a closed fist, threw her into a coffee table causing

bruising and scratches. The offender told the victim when he got out of jail he would hurt her. The assault caused the victim's tooth to become loose.

At the October 11, 2019 revocation hearing, the victim, Jessica Beets, testified that the defendant was the father of her one-year-old daughter. She said that on August 16, 2019, the defendant telephoned her at approximately 9:30 p.m. and "said that he had left his phone in my car, that he needed it." The defendant also "wanted to know where I was at, what I was doing, why wasn't I at home, that he had done been by my home twice to get his phone out of my car." The victim, who had been "out riding around" with a friend, took her friend home and then returned to her own home. She said that "no longer than five minutes that I was at home, he was beating on my door."

According to the victim, she "was getting my children ready for bed" so she "yelled from my kids' room" for the defendant "to hold on a minute." She said that when she "opened up the door, I rolled my eyes at him and I shut the door back." The victim clarified that although the defendant did not have a key to her apartment, she "let him see both children whenever he does come." The victim said that, despite the fact that she had shut the door, the defendant came in uninvited and sat down on the couch. The victim testified that she asked the defendant if he was "in a rush" because she was too busy at that moment with her children to go to the car to get his telephone. She said that she told him, "I can give you the key and you meet me right here at the top of the steps and you give my keys back."

The victim testified that the defendant went to the car and got his telephone but that when he returned to the steps, "he refused to give me my keys." The victim recalled that the defendant said something to the effect of "if you're going to act like this, I just want my stuff." At that point, "it started escalating. And . . . he had tried to push me down the steps whenever I went -- trying to go around him. And I got around him, got back up to my house, and I shut the door." For a second time, the defendant entered the victim's home despite that she had closed the door.

The victim said that the defendant, who still refused to return her keys, took "off to my bedroom, which is the back room of the apartment." The victim recalled that she "told him multiple times to get out of my house. He's not on my lease. He pays no bills." While the defendant was in the victim's bedroom trying to retrieve some clothing she had laundered for him, she "kept telling him, 'Get out of my house.' He wouldn't get out of my house. That's when I pulled my knife on him." The victim said that she drew her knife because she did not know whether the defendant, whom she knew to carry a gun, "had his gun. My children were in that home and I'm in that home. I'm protecting me and my children." She described her knife as "a little pocket knife" that also had "a can opener

and stuff on it." The victim denied threatening the defendant with the knife but said that she firmly told him to leave. The victim said that the defendant did not appear frightened but that he walked back to the living room, and she put her knife away.

According to the victim, when the defendant returned to the living room, "he was still putting his stuff over into the bag" and "[h]e had still not gave me my keys back." The victim recalled that the situation "started really escalating. It really happened all over me finding out that he had another girl pregnant." The victim said that when she confronted the defendant with this information, he replied "'F' you and 'F' your two babies, too." When the victim tried to grab her car keys, the defendant "put them straight in his pocket." The victim said that she walked to the door, stood in front of it, and "told him, you need to give me my car keys before you walk out this door." The defendant "pulled my car keys out of his pocket and slung them across my island that I have at home." The defendant "then pushed me away from the door into the wall. I pushed him, I told him to keep his paws to himself, they're not for hitting me. And I moved from the wall that he pushed me into to my island." At that point, the defendant "dropped everything that he had in his hands, he hit me a good 30 times in my head." The victim said that the defendant "put me in a headlock, which knocked me unconscious. He broke two of my teeth." The victim recalled that when she "come to, I was laying on my coffee table broke, and he was standing over me like he had killed me."

The victim testified that she "started kicking him, and I got up, he got his stuff, he went to the steps." The victim told the defendant, "'That's it, I'm putting you in jail.'" The defendant "turned around, he said, 'B****, if I get out of jail, I'm going to kill you.'" The victim said that she telephoned 9-1-1 following the incident and that the police arrived after the defendant had left. While the police were interviewing the victim, the defendant's "mother, his other brother, and his girlfriend showed up." She recalled that the defendant's mother was "[c]ussing, talking about she hopes I tell the truth. I've told the truth."

The victim said that she did not go the hospital that night, which was a Friday, because she had no one to watch her children. She did go to the hospital on the following Monday, August 19, "[b]ecause I was hurting." Pictures that the victim took after the altercation with the defendant depicted bruises and scratches on the victim's body, including significant bruises on her ear and lower back. The victim said that she also suffered two broken teeth. She said that, as a result of emotional trauma from the incident, she was "on three different medicines now. I cannot work. I can't stand to be around a crowd of people. I panic. I can't take my children to the park."

During cross-examination, the victim again admitted that she pulled a knife on the defendant "[b]ecause he was in my home and would not leave." The victim

-3-

acknowledged that she telephoned the defendant's mother on "the night of the incident" before the two "started fighting" to tell her "she needed to get her son out of my house." The victim acknowledged that she told the defendant's mother that she would stab him if he did not return her keys and leave, adding, "This ain't the first time that Mr. Morgan has put his hands on me." She said that she called the defendant's mother instead of 9-1-1 "[s]o she could get her son out of my house before I put him in jail." The victim admitted that she did not lock the door after shutting it to the defendant, saying, "Why am I going to lock the door and he's got my car keys and my house keys? That's kind of crazy."

The defendant's mother, Denise Morgan, testified on behalf of the defendant that shortly after 11:00 p.m. on August 16, 2019, the victim "called me and she was screaming and she said, 'Mimi, I'm fixing to stab your son.'" Ms. Morgan asked what was going on, and the victim "said, 'I'm fixing to stab your son if he don't give me my keys to my car." Ms. Morgan remained on the telephone with the victim and "heard the whole dispute." She said that the victim "was mostly doing all the arguing and screaming and hollering." Ms. Morgan said that "eventually she ended up putting the knife down." After the victim put the knife down, Ms. Morgan heard what she believed to be the defendant "trying to get out of the house." Ms. Morgan said that she heard the defendant and the victim "struggling with each other" and "hitting" before "I didn't hear anything else. . . . It sounded like the phone dropped." Ms. Morgan said that she hung up at that point. The victim called her back a short time later and told her that the defendant "just beat the crap out of her basically" and that he had told her to kill herself.

Ms. Morgan asked a friend to drive her to the victim's apartment, and while Ms. Morgan waited for her friend to arrive, the victim telephoned her again. During this call, the victim "said, 'Mimi, Mimi, help me. I can't get to my babies. Mimi,' she said, 'my head is hurting so bad. It feels like my head is bleeding.'" Ms. Morgan testified that by the time she arrived at the victim's apartment, the police were there. She recalled that she knocked on the victim's door, and a police officer answered the door with his gun drawn and "pointed straight at me." Ms. Morgan said that "the living room [was] cleaned up. It doesn't even look like the coffee table had been broken or anything" and recalled that the victim told her that she intended to clean up the apartment "'so it won't look so bad when I call the police.'" Ms. Morgan testified that the victim did not appear to have a black eye or bruising on her face and that "[s]he was just red in her face and I could tell she had been crying."

During cross-examination, Ms. Morgan admitted that the victim "calls me every single time they get into it" and that she would act as a mediator between the two. She said that this had happened "[s]everal times." Ms. Morgan conceded that she heard "slapping noises" before hearing "a big old thump" that she believed was the victim dropping the telephone. She acknowledged that when she arrived at the victim's apartment

-4-

following the altercation, the leg of the coffee table was leaning and that the victim "was kind of shaking and her face was red."

The defendant testified that he used the victim's car earlier in the day on August 16, 2019, and that he left his cellular telephone in her car. He went by her apartment, but she was not at home. The defendant said that he then used his brother's telephone to call the victim, and "she said she was out and she don't know when she'd -- she'd be home." The defendant added that the victim "had been pretty snappy with me all day and I didn't know why." He recalled that he went back to the victim's apartment "probably about an hour later," at which time the victim was home. The defendant said that he "went to the door, knocked on the door. She opened the door, like she usually do, opens it and let the door go." He insisted that "the door never closed."

The defendant said that he sat on the couch while the victim put the children to bed and changed into her night clothes. At that point, he asked her for her keys so that he could go get his telephone, "[a]nd she ended up giving me the keys." The defendant testified that after he retrieved his telephone from the victim's car, "I don't much remember what was said, but I was just like, if you're going to keep acting like that, I'll just get the rest of my stuff while I'm here." The victim asked him to return her keys, but he walked past her into her bedroom to get his clothes. The defendant claimed that he had already "set the keys on the bed. And they was just setting there. And I'm grabbing my clothes and she kept yelling, give me my keys." The defendant said that, at that point, he heard the victim run toward the front of the apartment followed by the slamming of a drawer. When the victim returned to the bedroom, "she has the phone in her left hand and a knife in the right hand. And she's calling my momma. And she's like, you need to come get your son before I stab the crap out of him."

The defendant testified that he told the victim to put the knife down. He admitted that he was "mad, because I feel like my life is in danger." He conceded, however, that he "didn't really think she would actually, you know, stab me, you know. We have arguments all the time, but it would never get like -- physical like this." He said that he went into the living room and put his clothes into a bag while the victim was "still on the phone arguing with my mom." The defendant claimed that he went into the laundry room to get his clean clothes and that when he returned, the victim threw the knife at him. He said that she also threw a water bottle at him. At that point, the defendant "grabbed my bag and started heading out the door," but the victim said "like, you not going nowhere. And she was like give me my keys." He admitted that he had taken the victim's keys off of the table and that he threw the keys "like in the kitchen area, which is also the laundry area." He added, "I'm like, there's your keys, and I move out the way, and then I'm trying to leave." He said that the victim refused to move, "so I take my shoulder . . . and I try to push her over and I pull my bag up to push down on the doorknob, and she hits me."

-5-

The defendant claimed that he told the victim to "quit putting your hands on me. And she hits me again" "in my left eye." He said that after the victim struck him a second time, "I just lost it." The defendant testified that he dropped his bag and "hit her three times and I grabbed her." He said that the victim "hollered my name and I let her go and she fell back on the coffee table." He denied putting the victim in a headlock, insisting that he "grabbed her like by her waist."

During cross-examination, the defendant admitted that he did not return the victim's keys after he retrieved his telephone from her car. He said that he decided to collect all of his belongings "[o]nce she had an attitude and she just kept mouthing off, and I was just like, you know what, I'm just going to get all my stuff now so I don't have to worry about this anymore." He acknowledged that the victim "started getting mouthy" after he refused to return her keys. The defendant said that he became angry when the victim pulled out her knife but said that he "didn't think she was going to stab me, but I'm not knowing." The defendant maintained that he did not just return her keys and leave because he wanted his stuff. He said that the victim hit him after he "used my body weight to move her out the way." He admitted that he hit the victim three times and that he likely struck her face. After that, he grabbed her, and "then when I grabbed her it was like she was trying to get away or something. And I grabbed her and she yelled my name and I let her go, and she fell back on the table." He denied that the victim ever appeared as though she had lost consciousness.

At the conclusion of the hearing, the State asked the trial court to revoke the defendant's probation based upon his violent behavior toward the victim. The defendant asked that the trial court not revoke his probation, arguing that although the defendant struck the victim, he did so only in self-defense. The trial court observed that it was still not clear "exactly what happened in that apartment" but that it was clear that the defendant had hit the victim. The court concluded that the defendant was ultimately responsible for the entire incident:

> But what we keep ignoring here is what escalated this whole thing, and that is all at his feet. He comes to get his phone, whatever gets everything started, gets it started, but it's uncontradicted that she asked him multiple times for her car keys. He wouldn't give it to her. Instead, he's going to do what he wants to do. He's going to go where in that apartment he wants to go. And it doesn't matter what happens. She can pull a knife on him, it doesn't matter. He's going to do what he wants.

-6-

The court revoked the defendant's probation, finding that "[t]here is clearly proof in this record that you have violated the terms and conditions of your probation." The court ordered the defendant to serve the balance of his sentence in confinement based upon his history of violent behavior.

In the written revocation order, the trial court found "that the defendant has been guilty of violating the laws of this State, and has otherwise violated the conditions of his probation."

In this timely appeal, the defendant asserts that the trial court violated due process principles by revoking his probation on a basis not alleged in the violation warrant. He argues that the trial court revoked his probation solely on the basis that the defendant took the victim's keys and refused to return them. The State contends that the trial court did not err.

The accepted appellate standard of review of a probation revocation is abuse of discretion. *See State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *see also State v. Reams*, 265 S.W.3d 423, 430 (Tenn. Crim. App. 2007). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). The 1989 Sentencing Act expresses a burden of proof for revocation cases: "If the trial judge finds that the defendant has violated the conditions of probation and suspension by a preponderance of the evidence, the trial judge shall have the right by order duly entered upon the minutes of the court to revoke the probation and suspension of sentence . . . ." T.C.A. § 40-35-311(e)(1).

Upon a finding by a preponderance of the evidence that the defendant has violated the conditions of probation, the trial court may revoke the defendant's probation and "[c]ause the defendant to commence the execution of the judgment as originally entered, or otherwise in accordance with § 40-35-310." *Id.*; *see also Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). Following a revocation, "the trial judge may order the original judgment so rendered to be in full force and effect from the date of the revocation of the suspension, and that it be executed accordingly." T.C.A. § 40-35-310(a). In other words, "[t]he trial judge retains the discretionary authority to order the defendant to serve the original sentence." *Reams*, 265 S.W.3d at 430 (citing *State v. Duke*, 902 S.W.2d 424, 427 (Tenn. Crim. App. 1995)).

To be sure, a probationer is entitled to notice of the bases upon which the State seeks to revoke probation, and he or she is entitled to a hearing. *See Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973); *State v. Stubblefield*, 953 S.W.2d 223, 225 (Tenn.

Crim. App. 1997); *see also* T.C.A. § 40-35-311.  We disagree that the trial court based its decision solely upon the defendant's taking and refusing to return the victim's keys.  Instead the record indicates that the trial court credited the victim's version of the events and concluded essentially that, even if, as the defendant claimed, he struck the victim only after she struck him first, the defendant had created the situation by refusing to return the victim's car keys.  The court also noted the defendant's intimidating behavior, saying, "[H]e's going to do what he wants to do.  He's going to go where in that apartment he wants to go."  The evidence presented at the hearing established by a preponderance of the evidence that the defendant violated the terms his probation by behaving "in an assaultive, abusive, threatening[,] and intimidating manner" toward the victim.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE