IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 13, 2021


**STATE OF TENNESSEE v. BOBBY JOE YOUNG, JR.**


**Appeal from the Circuit Court for Montgomery County**
**Nos. 40700635(CC07-CR-637), 41301198(CC13-CR-1173), CC14-CR-1339[1]**
**William R. Goodman, III, Judge**

———————————

**No. M2019-01965-CCA-R3-CD**

———————————

The defendant, Bobby Joe Young, Jr., appeals the revocation of the sentences of probation imposed for his convictions of aggravated assault, robbery, and escape, arguing that the trial court erred by ordering that he serve the balance of the total effective sentence in confinement and that the trial court miscalculated the remaining balance of the total effective sentence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal), and Kenneth Merriweather, Assistant District Public Defender (at hearing), for the appellant, Bobby Joe Young, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; John Carney, District Attorney General; and Helen Young, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

We begin by noting that the record in this case does not contain the judgments for any of the defendant's convictions. It also does not contain any of the plea documents related to any of the convictions. We glean those meager procedural facts available to us from the trial court's order of May 12, 2016, and the probation violation reports.

---

[1] Montgomery County changed its case numbering system, and those cases pending at the time of the change were assigned new case numbers. Because both the old and new numbers are used interchangeably throughout the record, we have included both to avoid any potential confusion.

On May 12, 2016, the trial court issued an order, which was prepared by the defendant's counsel and agreed to by the State, relative to the disposition of a probation violation warrant that was issued on July 30, 2015, "clarifying sentence structure and credits" for all of the defendant's cases. In the order, the trial court explicitly stated that "[t]o the extent the following is or appears to be inconsistent with earlier judgments and orders of this Court, it is the express intent of the Court that the terms of this order shall prevail." The order provides that the defendant received a one-year sentence in case number 40701007 and that he satisfied that sentence on July 23, 2009. The defendant received a six-year sentence in case number 40801224, to be served consecutively to the one-year sentence in case number 40701007, and the order indicated that the sentence in case number 40801224 "expired on September 15, 2013." The court stated that the 11-month-and-29-day-sentence imposed in case number 40800952 was to be served consecutively to the six-year sentence in case number 40801224. The court further found that the sentence in case number 40800952 "commenced on September 16, 2013 and expired no later than September 14, 2014," and, as a result, dismissed the then-pending revocation warrant "with respect to this case."

The May 12, 2016 order indicates that the defendant received a two-year sentence in case number 40900127 to be served concurrently with the 11-month-and-29-day-sentence imposed in case number 40800952 and consecutively to the six-year sentence imposed in case number 40801224. The court found that the two-year sentence in case number 40900127 "commenced on September 16, 2013," and would have expired on September 15, 2015, but for the issuance of the probation revocation warrant on July 30, 2015. Notably, the probation violation reports that are at issue in this case include a "Sentence Start Date" of September 15, 2015, which would align with the expected expiration date for the sentence imposed in case number 40900127. The filing of the probation violation warrant on July 30, 2015, tolled the expiration of that sentence, and no pretrial credits were applied in that case because "all such credits earned prior to September 15, 2013 applied to Docket No. 40801224." The order does not indicate how many such credits were applied.

The trial court concluded that, as of May 12, 2016, the 10-year sentence of probation imposed in case number 40700635 had "not yet commenced" because the sentence in case number 40900127 had not yet expired. The order indicates that the defendant received a three-year sentence in case number 41301198 to be served consecutively to the 10-year sentence imposed in case number 40700635 and that that sentence had also not yet commenced. The defendant received a sentence of 11 months and 29 days in case number CC14-CR-1339, to be served consecutively to the three-year sentences in case number 41301198. Given the consecutive alignment of this sentence, it also had not yet commenced at the time of the May 12, 2016 order.

The order also provided that the defendant's sentences of probation in cases 40800952, 40900127, 40700635, 41301198, and CC14-CR-1339 were tolled by the filing of a revocation warrant on September 8, 2014, and that the defendant was reinstated to probation on these cases on May 14, 2015, with confinement credits from September 10, 2014, to May 14, 2015, to be applied, presumably, to case number 40800952.

The revocation warrant that was the subject of the May 12, 2016 order issued on July 30, 2015. The court concluded that the defendant had violated his probation and reinstated him to probation for a term of 15 years, 11 months, and 29 days to be served in the following order: case number 40900127 (two years), case number 40700635 (10 years), case number 41301198 (three years), case number CC14-CR-1339 (11 months and 29 days). The court awarded the defendant credit for his confinement from "August 13, 2014 to August 20, 2014"; "September 10, 2014 to May 14, 2015"; and "October 8, 2015 to November 13, 2015," for a total of 292 days.

At the revocation hearing associated with the May 12, 2016 order, the defendant's counsel indicated that the defendant's sentence in case number 40900127 "will expire later this year." Upon being questioned by the trial court at that same hearing, the defendant agreed that his cumulative sentence as of that hearing was 15 years, 11 months, and 29 days.

A probation violation report filed on November 7, 2016, alleged that the defendant violated the terms of his probation in case numbers 40700635, 41301198, and CC14-CR-1339 by committing the new offenses of being a felon in possession of a firearm and possession of drug paraphernalia. That report indicates that on July 17, 2009, the defendant pleaded guilty in case number 40700635 to three counts of aggravated assault in exchange for a 10-year sentence of probation to be served consecutively to the sentence imposed in case number 40900127. The report does not indicate a sentence length for case number 40900127 but indicates that the sentence in that case expired on September 15, 2015. An amended probation violation warrant filed on December 5, 2016, contains the same recitation of the defendant's case history and again alleges that he violated the terms of his probation by possessing a firearm and drug paraphernalia. The December 5, 2016 report also adds an allegation that the defendant violated the terms of his probation by failing to report his arrest on these new charges. This report similarly mentions that the defendant's three-year sentence in case number 41301198 was to be served consecutively "to cases 40900127, 40700635, and 40800952" without naming a conviction offense or sentence length for cases 40900127 or 40800952.

A probation violation report filed on September 14, 2018, again contains the same recitation of the defendant's supervision history and alleges that the defendant

violated the terms of his probation by garnering arrests for robbery, possessing a firearm, resisting arrest, and driving on a revoked license. The report also notes that a January 18, 2018 charge of possession of drug paraphernalia was dismissed upon the payment of costs in June 2018. Again, cases 40900127 and 40800952 are listed as part of the defendant's case history, but no information is included regarding the conviction offenses or sentence lengths. All of the probation violation reports and warrants indicate a then-pending total effective sentence of 13 years, 11 months, and 29 days. None lists case number 40900127 as part of the revocation proceeding. Indeed, this case number is not included in any of the probation violation documents after the May 12, 2016 order except in the history of supervision portion of the violation reports.

At the October 15, 2019 hearing on the probation violations,[2] Clarksville Police Department Officer Holden Hudgin testified that at approximately 10:41 p.m. on November 3, 2016, he stopped a Nissan Xterra being driven by the defendant's son for failing to use a turn signal when making a right turn. The defendant was a passenger in the car. Both the defendant and his son agreed to be searched, and, during the search of the defendant's person, Officer Hudgin found "a plastic syringe" in his sock. After he discovered the syringe, Officer Hudgin asked for permission to search the vehicle. Both the defendant and his son refused, so Officer Hudgin asked "K-9 Officer Medford," who had arrived on the scene shortly after Officer Hudgin stopped the Xterra, to have the dog perform "an open air search of the vehicle." Officer Medford told Officer Hudgin "that his dog indicated on the odor of narcotics inside the vehicle." Based upon the dog's indication, Officer Hudgin searched the Xterra and found "a tan zippered bag with multiple items of drug paraphernalia" under the passenger's seat where the defendant had been sitting. Inside the unlocked glove compartment in front of the seat where the defendant had been sitting, Officer Hudgin found a loaded nine-millimeter Ruger handgun.

During cross-examination, Officer Hudgin acknowledged that the defendant told him that the car belonged to the defendant's father and that the gun belonged to the defendant's mother. He said that he had spoken with the defendant's mother about the gun but said that he could not remember what she had said about its ownership. Officer Hudgin agreed that none of the items discovered on the defendant's person or in the zippered bag were per se illegal and that none of the items had been subjected to forensic testing.

During redirect examination, Officer Hudgin said that one of the items found inside the zippered bag was the bottom of a "tin can." He explained that "[t]he bottom of that can is removed" and that "the bowl shape of that bottom of that can is used to put drugs in there to be heated up and broken down, to be ingested through a syringe."

---

[2]    The hearing also addressed the defendant's motion to suppress evidence that arose from the arrests that led to the filing of the probation violation reports.

-4-

Jennifer Jones, manager of the Cash Express at 989 South Riverside Drive, testified that at approximately 5:15 p.m. on September 12, 2018, she "was at the counter waiting on my customer" when a man walked in front of the store window from the direction of Kent Glass and then walked into the Cash Express with a shotgun. The man was dressed in dark clothing and wore sunglasses and a black ball cap. The man ordered the customer, Lillian Porter, to lie on the ground and then told Ms. Jones to give him the money from the cash register, which he then placed into a white plastic bag. The man asked how much money was in the register, and, when Ms. Jones replied "that I thought it was $500 or $600," the man said, "'I know you got more money than that.'" She told him that the rest of the money was "in a safe, but it was under the counter and I had to get the key." The man warned Ms. Jones that she "better not be hitting an alarm" as she opened the safe. She "pulled the whole money bag out and I handed it to him." The man told Ms. Jones to lie on the floor and "said, 'Give me 15 seconds before you call the law or I'll shoot you.'" After the man left the Cash Express, Ms. Jones looked up and saw the man walk back in the direction of Kent Glass and the empty car lot beyond. She then locked the door and telephoned 9-1-1. Ms. Jones said that $2,741.05 was taken during the robbery.

Clarksville Police Department Detective Andrew Henry testified that on September 12, 2018, another officer made a radio call "that he had seen a white male running through a parking lot over on Riverside Drive, carrying what appeared to be a rifle or a shotgun." That same officer said that he had checked with businesses in the area and had learned that the Cash Express had been robbed and that "the vehicle that had left the scene had been rounded" and "could have been beige or maroon" in color. Detective Henry "continued traveling up the bypass looking for the suspect vehicle." As he approached Baltimore Drive, Detective Henry "saw a maroon S.U.V. that appeared to be rounded" in the manner as described by the other officer. Detective Henry observed "two white males in the vehicle. And the driver saw me, and started to try to put his seatbelt on." Detective Henry fell in behind the vehicle and then initiated a traffic stop "at the intersection of Vista and Paradise."

Detective Henry said that the vehicle, a Chevy Equinox, pulled into the parking lot of a church and stopped. Detective Henry recognized the defendant as the driver of the vehicle. Detective Henry said that the defendant "was extremely sweaty" and "did appear to be kind of nervous." The defendant told Detective Henry that he did not have a driver's license. After other officers, including Officer Hudgin and Officer Medford, arrived, the defendant gave Detective Henry permission to search his person and the vehicle. Detective Henry said that his search of the defendant was not thorough, so he told Officer Hudgin to "feel free to search him again." As Officer Hudgin attempted to search the defendant, the defendant pulled away from Officer Hudgin and "[i]t seemed like he was attempting to run." Detective Henry said that the defendant had one arm "kind of

-5-

going down towards his waistline," so Detective Henry struck him "several times until he released that." At that point, Detective Henry observed a large amount of cash coming from the defendant's pant leg. Officers found even more cash stuffed inside the defendant's pants. Inside the car, Detective Henry found a plastic bag inside "an open wooden box full of what appears to be silver spoons and some other, like, trinkets." Detective Henry said that the box did not "appear to be something that [the defendant] would normally have in his possession."

Officer Hudgin returned to the stand to testify about his involvement in the September 12, 2018 traffic stop. He said that after Detective Henry finished searching the defendant's vehicle, the detective began to write a citation. Officer Hudgin observed the defendant's behavior as Detective Henry filled out the citation. He described the defendant as "visibly kind of shaky, nervous looking, sweaty." Officer Hudgin "noticed that [the defendant] kind of had his hands around his groin area" and that "one of his pants leg[s] is tucked inside of his sock." Based on these observations and his conversation with Detective Henry about whether the defendant had been searched, Officer Hudgin approached the defendant, who "was having a conversation with Officer Medford, and I told him that he could keep talking, I was just going to lift his pants leg up." Officer Hudgin said that "once I pulled his pant leg up, I noticed . . . a five-dollar-bill was hanging loose, and once I went to pull it out [to] . . . see . . . if there was something wrapped up in it, he began to try to pull away from us and take off running." The officers "tackled him to the ground and placed him in custody."

After placing the defendant in custody, officers found more cash inside the defendant's pants. Officers then went to the address where the defendant claimed to have been living at the time and were granted entry by the defendant's girlfriend, who was the tenant. Officer Hudgin and Detective Brittany Matos searched the apartment. "Detective Matos lifted up the couch cushion and" observed "a double-barreled shotgun. I believe there was some ammunition with it and . . . some gloves nearby."

Clarksville Police Department Detective Brittany Matos testified that officers collected $1,215 dollars from the defendant's person during the September 12, 2018 traffic stop following the robbery of the Cash Express. Detective Matos confirmed that, after the defendant's girlfriend gave them permission to search her apartment, they discovered a double-barreled shotgun and latex gloves under a cushion on the couch. Detective Matos testified that the discovery of the gloves with the shotgun was significant because the perpetrator of the robbery could be seen wearing similar gloves in the surveillance video.

Detective Matos testified that, following the defendant's arrest, he placed several calls to his girlfriend. Audio recordings of the calls were played for the trial court.

-6-

The defendant was eventually charged with aggravated robbery, unlawful possession of a firearm by a convicted felon, driving on a revoked license, and evading arrest.

Clarksville Police Department Sergeant Nick Newman testified that he had known the defendant's girlfriend, Cheyenne Halberd, for several years and that he contacted Ms. Halberd after he learned that the defendant might have been involved in the Cash Express robbery. When Ms. Halberd told him that the defendant had not arrived as scheduled to pick her up from work, Sergeant Newman responded that the defendant had been arrested. Ms. Halberd arranged to come to the scene of the defendant's arrest so that she could get her children's car seats out of the vehicle. Ms. Halbert told the officers "that she needed to go pick up the kids and she would be right back and she would let us in the apartment. And that's what she did."

At the conclusion of the hearing, the trial court found by a preponderance of the evidence that the defendant violated the terms of his probation on November 3, 2016, by possessing a gun and drug paraphernalia. The court also concluded "that the State has established by a preponderance of the evidence that [the defendant] was the one engaged in the robbery or the one holding that shotgun pointed directly at the operator, Ms. Jones, . . . at the Cash Advance" and that the defendant's involvement in the robbery "established a violation of probation." The court found that the defendant had a "three-year sentence then running consecutive to the ten-year sentence and an 11-29 consecutive to those." The court determined that "[p]robation has not been a successful alternative" for the defendant and ordered that he serve the balance of his sentence in confinement.

The defendant filed a timely notice of appeal to this court, and then his counsel moved to withdraw based upon counsel's impending move out of state. This court remanded the case to the trial court for the appointment of counsel on appeal. At the December 5, 2019 proceeding to appoint new counsel, the defendant questioned the balance remaining on his sentences. He argued that the May 12, 2016 order conflicted with the plea paperwork for case number 40900127 in that the paperwork did not "indicate that it runs consecutive to Case 40801224." He also claimed that the 10-year sentence imposed in case number 40700635 should have been the first sentence served and that, based upon a sentence-imposed date of July 2009, that sentence had expired. The prosecutor explained that the defendant was convicted by a jury in case number 40801224 and that, at the time of that conviction, the other cases were pending. In anticipation of the sentencing hearing in case number 40801224, "we entered settlements . . . on the ten-year and the two-year." The State also pointed out that, because the defendant was "on bond for each of them when the other offense was committed," consecutive sentences were mandatory regardless of what either the judgment or the plea paperwork said. The prosecutor said that the purpose of the May 12, 2016 order was to clear up any remaining confusion and that the parties agreed that, "going forward from May 12th of 2016, . . . this is what was remaining on

-7-

these sentences." The State noted that the defendant was present and represented by counsel when the parties agreed to the order. Observing that the defendant's "criminal history is such that it almost takes somebody with a C.P.A. certification to be able to totally clarify," the trial court stated that "that's what led then to the order of May 12th, 2016." The court agreed that "[t]here is obviously an error in these two judgments that are inconsistent" and explained "[t]hat's why we need[ed] orders at the time to clarify what the Court is saying."[3] The court said that it would calculate the remaining balance on the sentence in accordance with the May 12, 2016 order.

The probation revocation order for case number 40700635, which was filed on January 2, 2020, indicates that the defendant's probation was revoked on October 15, 2019, and that the trial court awarded him a total of 408 days credit. The revocation orders for case numbers 41301198 and CC14-CR-1339, also filed on January 2, 2020, indicated that the defendant's probation was revoked on October 15, 2019, and that "all credits" were applied to case number 40700635. At the December 5, 2019 proceeding, the State objected to the calculation of credits on the revocation order that had been submitted to the State for review, but it is not clear from this record whether the objectionable orders were the ones that were ultimately entered.

In this timely appeal, the defendant challenges the trial court's order that he serve the balance of his sentences in confinement and the trial court's calculation of the sentence balance.

The accepted appellate standard of review of a probation revocation is abuse of discretion. *See State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *see also State v. Reams*, 265 S.W.3d 423, 430 (Tenn. Crim. App. 2007). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). The 1989 Sentencing Act expresses a burden of proof for revocation cases: "If the trial judge finds that the defendant has violated the conditions of probation and suspension by a preponderance of the evidence, the trial judge shall have the right by order duly entered upon the minutes of the court to revoke the probation and suspension of sentence . . . ." T.C.A. § 40-35-311(e)(1).

Upon a finding by a preponderance of the evidence that the defendant has violated the conditions of probation, the trial court may revoke the defendant's probation and "[c]ause the defendant to commence the execution of the judgment as originally

---

[3]    The record indicates that the trial court examined judgment forms provided by the defendant, but the defendant made no effort to exhibit the documents to the proceeding.

entered, or otherwise in accordance with § 40-35-310." *Id.*; *see also Stamps v. State*, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). Following a revocation, "the trial judge may order the original judgment so rendered to be in full force and effect from the date of the revocation of the suspension, and that it be executed accordingly." T.C.A. § 40-35-310(a). In other words, "[t]he trial judge retains the discretionary authority to order the defendant to serve the original sentence." *Reams*, 265 S.W.3d at 430 (citing *State v. Duke*, 902 S.W.2d 424, 427 (Tenn. Crim. App. 1995)).

As to the defendant's claim that the trial court erred by ordering that he serve the balance of his sentence in confinement, we conclude that the trial court does not abuse its discretion by choosing incarceration from among the alternatives available following the revocation of his probation.

We next consider the defendant's claim that the trial court erroneously calculated the balance of the total effective sentence left to be served. In our view, the State's characterization of the defendant's challenge to the calculation memorialized in the trial court's May 12, 2016 order as time barred misses the gravamen of the defendant's actual claim. What the defendant has deemed a challenge to the trial court's calculation of his sentence is actually a claim that the first of the series of sentences included in the total effective sentence expired before the trial court's May 12, 2016 order. This is essentially a challenge to the subject matter jurisdiction of the trial court. Because the defendant cannot waive subject matter jurisdiction, the timeliness of his challenge is not an issue. *See State v. Demetrius D. Blakemore*, No. W2019-00555-CCA-R3-CD, 2020 WL 864170, at *2 (Tenn. Crim. App., Jackson, Feb. 19, 2020) (citing *State v. Almeko Chiffon Woods*, No. W2007-02025-CCA-R3-CD, 2008 WL 3983107, at *3 (Tenn. Crim. App., Jackson, Aug. 28, 2008) (noting that a defendant has no power to waive subject matter jurisdiction); *see also State v. Nick Defillipis*, No. M2007-01647-CCA-R3-CD, 2008 WL 2388632, at *3 (Tenn. Crim. App., Nashville, June 12, 2008)). Thus, if the sentence at issue had expired, the trial court's inclusion of that sentence in the May 12, 2016 order was void.

That being said, the record before us is insufficient to determine whether the challenged sentence had, in fact, expired before the entry of the May 12, 2016 order. Importantly, the record does not contain the judgment forms for any of the defendant's convictions. Instead, the defendant relies on assertions made in the probation violation reports regarding the length of the total effective sentence. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which record "shall consist of . . . the original of any exhibits filed in the trial court," Tenn. R. App. P. 24(a). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). The trial court's May 12, 2016 order attempted to make sense of the various sentences and the credits to be applied to each. In the absence of

evidence to the contrary, we must presume that the trial court's calculation, which was based on the May 12, 2016 order, was correct.

Accordingly, we affirm the judgment of the trial court revoking the defendant's probation and ordering him to serve the balance of his sentence in confinement.

_____
JAMES CURWOOD WITT, JR., JUDGE